# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF SOUTH CAROLINA
## COLUMBIA DIVISION

| | |
|---|---|
| EDWARD KUBIK, DEONDRA RANDLE, and ALLYN BASORE; individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>FAIVELEY TRANSPORT S.A.; FAIVELEY TRANSPORT NORTH AMERICA, INC.; KNORR-BREMSE AG; KNORR BRAKE COMPANY; NEW YORK AIR BRAKE LLC; and WESTINGHOUSE AIR BRAKE TECHNOLOGIES CORPORATION d/b/a WABTEC CORPORATION,<br><br>Defendants. | Civil ActionNo. 3:18-cv-01618-MGL<br><br>**CLASS ACTION COMPLAINT**<br><br>(JURY TRIAL DEMANDED) |

Plaintiffs Edward Kubik, Deondra Randle and Allyn Basore, individually and on behalf of the proposed Class, by and through their counsel, for their Complaint against defendants Faiveley Transport S.A., Faivelely Transport North America, Inc., Knorr-Bremse AG, Knorr Brake Company; New York Air Brake LLC; and Westinghouse Air Brake Technologies Corporation d/b/a Wabtec Corporation (collectively "Defendants") hereby state and allege as follows:

## NATURE OF THE ACTION

1. This class action challenges a series of agreements between three of the world's largest rail equipment suppliers not to solicit, recruit, hire without prior approval, or otherwise compete for employees (collectively, "No-Poach Agreements").

2. For many years, beginning as early as 2009 and continuing until at least April 2018, these No-Poach Agreements were agreed upon, monitored and enforced by high-level executives of Defendants and their co-conspirators, with many critical contacts and communications between

the Defendants happening in this District.

3. These No-Poach Agreements restrained competition in the relevant labor market, allocated employees between the companies, and deprived employees of the ability to seek higher paying jobs or negotiate for better compensation. Accordingly, the No-Poach Agreements are naked, horizontal, market-allocation agreements that are *per se* violations of Section 1 of the Sherman Act.

4. Plaintiffs bring this action to recover treble damages, attorneys' fees, litigation expenses, and court costs, for violations of Sections 1 and 3 of the Sherman Act of 1890 ("Sherman Act"), 15 U.S.C. §§ 1 and 3, pursuant to Sections 4 and 16 of the Clayton Act of 1914 ("Clayton Act"), 15 U.S.C. §§ 15 and 26.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the subject matter of this action pursuant to Section 4(a) and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and 28 U.S.C. §§ 1331 and 1337.

6. Defendants engaged in conduct both inside and outside the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

7. Venue is proper in this District pursuant to Sections 4(a) and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. §§ 1391 (b) and (c) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below was carried out in this District, and one or more Defendants reside, are found, have agents, are licensed to do business, are doing business, or transact business in this District.

8. This Court has personal jurisdiction over each Defendant because each Defendant: (a)

transacted business in the United States, including in this District; (b) monitored and enforced their unlawful agreements upon their employees, agents, and/or subsidiaries in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; and (d) was engaged in an labor market allocation conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to, the property of persons and entities residing in, located in, or doing business throughout the United States, including in this District.

## THE PARTIES

### A. Plaintiffs

9. Plaintiff Edward Kubik is an individual residing at Fort Worth, Texas. During the Class Period, Mr. Kubik worked for Wabtec as a Senior Engineer. As a result of the No-Poach Agreements, Mr. Kubik's compensation was suppressed during the time he worked for Wabtec.

10. Plaintiff Deondra Randle is an individual residing at Boston, Massachusetts. During the Class Period, Mr. Randle worked for Wabtec as both a Design Engineer and a Systems Engineer. As a result of the No-Poach Agreements, Mr. Randle's compensation was suppressed during the time he worked for Wabtec.

11. Plaintiff Allyn Basore is an individual residing at Greenville, South Carolina. During the Class Period, Ms. Basore worked for Wabtec as a Director of Programs. As a result of the No-Poach Agreements, Ms. Basore's compensation was suppressed during the time she worked for Wabtec.

### B. Knorr Defendants

12. Knorr-Bremse AG is a privately-owned German company with its headquarters at Moosacher Str. 80, d-80809 München, Germany. It touts itself as the "world's leading

manufacturer of braking systems and supplier of additional sub-systems for rail and commercial vehicles." In 2017, Knorr had an annual revenue of over $7 billion.

13. Knorr Brake Company is a Delaware corporation with its headquarters at 1 Arthur Peck Dr., Westminster MD 21157. It manufactures train control, braking, and door equipment used on passenger rail vehicles.  Knorr Brake Company is a wholly-owned subsidiary of Knorr-Bremse AG.

14. New York Air Brake LLC is a Delaware corporation with its headquarters at 748 Starbuck Ave., Watertown NY 13601. It manufactures railway air brakes and other train control products and systems.  New York Air Brake LLC is a wholly-owned subsidiary of Knorr-Bremse AG.

15. Knorr-Bremse AG, Knorr Brake Company, and New York Air Brake LLC are referred to collectively herein as "Knorr" or the "Knorr Defendants."

### C. Wabtec Defendants

16. Westinghouse Air Brake Technologies Corporation d/b/a Wabtec Corporation ("Wabtec") is a Delaware corporation headquartered at 1001 Air Brake Ave., Wilmerding PA 15148.  Wabtec Corporation touts itself as a "a leading supplier of value-added, technology-based products and services for freight rail, passenger transit and select industrial markets worldwide." Wabtec Corporation had global sales of $3.88 billion in 2017.

17. Wabtec Passenger Transit, Inc. is a business unit of Wabtec located in Spartanburg, South Carolina.  Wabtec Passenger Transit develops, manufactures, and sells rail equipment and services for passenger rail applications. Upon information and belief, although many of the conspiratorial actions described herein and by the Department of Justice ("DOJ") are attributed to executives at Wabtec Passenger Transit's South Carolina facilities, Wabtec Passenger Transit is a

business unit of Wabtec and not a separate corporate entity, and so is not named as a separate Defendant in this action. Plaintiffs reserve the right to amend this Complaint to separately name Wabtec Passenger Transit if it is shown that it is a separate corporate entity and if relevant liabilities are demonstrated to be held by that entity.

18. Aside from Wabtec Passenger Transit, Wabtec Corporation also maintains several other facilities in this District, including its Wabtec Global Services facility in Columbia, South Carolina, and its Transtech facility, located in Piedmont, South Carolina.

19. Faiveley Transport S.A. ("Faiveley") was the world's third-largest rail equipment supplier behind Wabtec and Knorr, and was a French société anonyme based in Gennevillers, France. On November 30, 2016, Faiveley, along with Faiveley Transport North America, was acquired by Wabtec. Faiveley is now a wholly-owned subsidiary of Wabtec.

20. Faiveley Transport North America is headquartered at 50 Beechtree Blvd, Greenville, South Carolina, and is a New York corporation. In the United States, Faiveley conducted business primarily through Faiveley Transport North America. Faiveley Transport North America was previously a wholly-owned subsidiary of Faiveley Transport S.A. and is now a wholly-owned subsidiary of Wabtec Corporation.

## AGENTS AND CO-CONSPIRATORS

21. Each Defendant acted as the principal of, or agent for, all other Defendants with respect to the acts, violations, and common course of conduct described in this complaint.

22. Various other persons, firms, companies, and corporations not named as Defendants knowingly and willingly conspired with Defendants and performed acts and made statements in furtherance of the conspiracy and in furtherance of the anticompetitive conduct.

23. The acts alleged to have been done by any Defendant or co-conspirator were

5

authorized, ordered, or done by its directors, officers, managers, agents, employees, or representatives while actively engaged in the management, direction, or control of such Defendant's or co-conspirator's affairs.

## **INTERSTATE TRADE AND COMMERCE**

24. During the Class Period, Defendants employed Class Members in many states, including South Carolina, Maryland, Colorado, New York, Texas, and Pennsylvania, among others.

25. There is high demand for, and a limited supply of, skilled employees with rail industry experience. In a competitive market, each Defendant would seek to hire employees of other rail industry participants, including the employees of other Defendants.

26. Defendants' No-Poach Agreements targeted a nationwide labor market, without differentiation or intra-state limitations.

27. In the absence of Defendants' No-Poach Agreements, Class Members could and would have entertained employment offers, solicitations, and cold-calls from locations across state boundaries and could have pursued such employment opportunities.

28. Accordingly, Defendants' conduct substantially affected interstate commerce throughout the United States and caused antitrust injury throughout the United States.

29. The restraints alleged in this complaint have directly and substantially affected interstate commerce in that Defendants have deprived Plaintiffs and Class Members of the benefits of free and open competition in the employment market for their services.

## **FACTUAL ALLEGATIONS**

30. Throughout the Class Period, Defendants manufactured parts for and serviced railroad equipment, which is a large and specialized industry. Defendants have a long history of

6

developing, manufacturing and selling related products in this market. In fact, Defendants were some of the first producers of the most commonly-used railway braking systems, with Westinghouse Air Brake Company ("WABCO"), the predecessor to Wabtec, first selling the widely-used Westinghouse air brake system which was designed in 1868, and Knorr first selling the Kunze-Knorr brake system since 1905.

31. As an example of Defendants' dominance in this market, the latest innovation in railway braking systems is the electronically-controlled pneumatic air brake system, or ECP. ECP brakes have been in use since 2007. Between May 2015 and December 2017, the DOJ imposed rules that tank cars loaded with certain hazardous materials must have ECP brakes in operation. Wabtec and Knorr's New York Air Brake LLC subsidiary are the **only** United States manufacturers of these kinds of brakes.

32. The railway industry has a number of industry associations that provide opportunities for Defendants to meet and form agreements. In particular, Defendants organized through the Air Brake Association ("ABA"), which has met regularly since 1893, and has Knorr's New York Air Brake LLC subsidiary and Wabtec as two of its seven partners.

33. Other railway trade associations which allowed Defendants to meet and conspire include the American Association of Railroad Superintendents (AARS); American Association of State Highway and Transportation Officials (AASHTO); American Public Transportation Association (APTA); American Railway Engineering and Maintenance-of-Way Association (AREMA); American Short Line and Regional Railroad Association (ASLRRA); Association of American Railroads (AAR); National Association of Railroad Passengers (NARP); North American Rail Shippers Association (NARS); and United States High Speed Rail (USHSR) Association.

34. Since as early as 2009, Defendants secretly entered into No-Poach Agreements with each other to eliminate competition between them for employees and thereby suppress employee compensation. Because of their large share of the relevant labor markets, these No-Poach Agreements effectively eliminated competition and substantially suppressed employee compensation, including that of Plaintiffs and Class Members.

A.   **Wabtec - Knorr Agreement**

35. Wabtec and Knorr entered into No-Poach Agreements, spanning the United States and encompassing multiple business units. Senior executives at Wabtec and Knorr, as well as their wholly-owned subsidiaries, agreed not to solicit or hire each other's employees, or not to do so without prior approval from the competitor, including project management, engineering, sales, and corporate officer roles.

36. For example, in a letter dated January 28, 2009, a director of Knorr Brake Company wrote to a senior Wabtec executive, stating "[Y]ou and I both agreed that our practice of not targeting each other's personnel is a prudent cause for both companies. As you so accurately put it, 'we compete in the market.'" This agreement was well known to senior executives at the parent level of both Wabtec and Knorr, including top Knorr executives in Germany who were included on communications about the No-Poach Agreements.

37. In accordance with this unlawful agreement, Wabtec and Knorr Brake Company informed their outside recruiters not to solicit employees from each other. In addition, the No-Poach Agreements limited consideration of even unsolicited applicants. For example, in 2010, a senior executive at Knorr Brake Company stated in an internal communication that he would not even consider a Wabtec candidate who independently applied to Knorr without the permission of Wabtec.

38.     The No-Poach Agreement between Wabtec and Knorr was not limited to the Knorr Brake Company subsidiary. For example, in July 2012, a senior executive at Knorr's New York Brake Corporation subsidiary told a human resources manager that he could not consider a Wabtec employee for a job opening due to the No-Poach Agreement between Wabtec and Knorr.

39.     Wabtec and Knorr actively policed potential breaches of the No-Poach Agreement between them. For example, in February of 2016, an executive board member at Knorr complained to a Wabtec executive officer that a recruiter solicited a Knorr employee for an opening at Wabtec. The Wabtec executive investigated the complaint, and reported back to Knorr that an outside recruiter was responsible and had subsequently been instructed to terminate his discussions with the candidate and actively refrain from soliciting Knorr employees due to the No-Poach Agreement.

**B.     Knorr - Faiveley Agreement**

40.     Senior executives at Knorr Brake Company also reached an express No-Poach Agreement with Faiveley Transport North America, an entity that is located in this District. In October 2011, a senior executive at Knorr Brake Company explained in an e-mail to a high-level executive at Knorr-Bremse AG that he had reached an agreement with Faiveley that "we do not poach each other's employees. We agreed to talk if there was one trying to get a job[.]"

41.     At a trade show in Berlin, German, in or around 2012, a senior executive from Knorr Brake Company discussed the No-Poach Agreement with an executive from Faiveley Transport North America. The executives continued to enforce the No-Poach Agreement through direct communications, and it was well known to the senior executives at both companies. For example, in October 2012, executives at Faively Transport North America stated in an internal communication that they were required to contact Knorr before hiring an engineer.

42. The companies continued their agreement until at least Wabtec's acquisition of Faiveley in July 2015.

### C. Wabtec - Faiveley Agreement

43. Senior executives at Wabtec Passenger Transit and Faiveley Transport North America also entered into a No-Poach Agreement, providing that the companies would not hire each other's employees without prior approval from the competitor. During the Class Period, both entities were located in South Carolina, and their proximity facilitated communications and meetings between them regarding the unlawful conspiracy.

44. Wabtec Passenger Transit and Faiveley Transport North America executives actively policed their agreement with each other through direct communications.

45. For example, in January 2014, Wabtec Passenger Transit executives expressly refused to engage in hiring discussions with a project manager who was then at Faiveley Transport North America without first getting permission from Faiveley Transport North America executives. In an internal e-mail, a Wabtec Passenger Transit executive explained that the candidate "is a good guy, but I don't want to violate my own agreement with [Faiveley Transport North America]." Only after receiving permission from Faiveley Transport North America did Wabtec Passenger Transit hire the project manager.

46. One month after that communication, a Wabtec Passenger Transit senior executive informed his staff that hiring Faiveley Transport North America's employees was "off the table" due to the agreement with Faiveley Transport North America not to engage in hiring discussions with each other's employees without the other's prior approval.

### D. The DOJ Investigation.

47. Upon information and belief, the DOJ's investigation into the No-Poach

Agreements started from its review of Wabtec's acquisition of Faiveley. As part of that review, the DOJ uncovered the existence of the No-Poach Agreements.

48. On April 3, 2018, the DOJ filed *United States v. Knorr-Bremse AG, et al.*, Case No. 1:18-cv-00747 (D.D.C.), setting forth its allegations that Defendants' No-Poach Agreements violated the Sherman Act. At the same time as that Complaint was filed, the United States also filed a Stipulation and proposed Final Judgment, which would settle the litigation after compliance with Antitrust Procedures and Penalties Act ("APPA"), 15 U.S.C. § 16(b)-(h). The Final Judgment would enjoin the Defendants from entering into, maintaining, or enforcing No-Poach Agreements, as well as require the Defendants to cooperate with the DOJ in investigating any further violations and to allow the DOJ to monitor Defendants' compliance. The proposed judgment did not, however, provide any monetary relief to the employees who were harmed by the No-Poach Agreements, and in fact, expressly provides that private litigants may still bring antitrust damage actions.

49. The DOJ's complaint stated that the No-Poach Agreements were "facially anticompetitive" and a *per se* violation of the Sherman Act.

50. The DOJ also filed a Competitive Impact Statement as part of the APPA requirements for the proposed settlement. As part of that statement, the DOJ stated that the No-Poach agreements were not reasonably necessary to any legitimate business transaction and that the agreements unlawfully allocated employees between the companies. The DOJ also wrote that labor agreements are not treated differently than any other input markets under antitrust law, stating that "No-Poach Agreements eliminate competition in the same irredeemable way as a customer- or market-allocation agreement, and the department has long prosecuted such agreements as hardcore cartel conduct." Accordingly, the DOJ found the No-Poach Agreements

11

to be "*per se* unlawful horizontal market allocation agreements under Section 1 of the Sherman Act."

    E.  **Effects of the Conspiracy.**

  51.  As previously stated herein, the United States rail equipment industry is highly concentrated. Defendants Wabtec and Knorr, along with now-acquired Faiveley, were the world's largest rail equipment suppliers and the top competitors in that industry throughout the Class Period.

  52.  There is high demand for, and limited supply of, skilled employees who have the requisite experience to work for Defendants. Thus, firms in the rail industry struggle to find potential employees. As the DOJ found, these firms can experience vacancies in critical roles for months.

  53.  Because of this, under normal market conditions, Defendants would have competed fiercely for experienced employees to try and gain any advantage over their rivals, including by directly soliciting their competitors' employees. Such competition would normally include high salaries and attractive benefit packages.

  54.  In a normal, competitive labor market, the practice of cold-calling, or directly soliciting employees of other companies, is often used to find qualified, experienced employees. Despite the name, "cold-calling" does not have to be conducted by telephone, but could also be in the form of direct written communications or emailed solicitations. Naturally, to lure an employee of another company away, the cold-calling company would typically have to provide a higher salary, or a more attractive job offer in some other respect.

  55.  Aside from having the opportunity to change employers and thereby obtain a higher salary, employees who receive such cold-calling offers can also use them as leverage to negotiate

higher compensation with their current employer. Thus, even employees who would not change companies may still receive higher pay as the result of receiving cold-call solicitations from other companies or from outside recruiters.

56. Employees receiving such offers may also discuss them with other employees at the same company, who may similarly use them to negotiate higher salaries or seek out the competitor company and express interest in a position there.

57. Moreover, to protect against losing employees to such outside solicitations, companies in a competitive labor market need to proactively keep their salaries and benefits at an attractive level for all employees. Any negotiation of subsequent raises in compensation would thus, in a competitive labor market, start from this higher baseline level. Accordingly, cold-call solicitations from one competitor to another have the effect of raising salaries even for those employees who do not directly receive the solicitations.

58. As described more fully above, Defendants came to agreements to avoid solicitation or hiring, either directly or through outside recruiters, one another's employees. Thus, Defendants' employees had lower salaries than they would otherwise have in a competitive labor market, and they did not have the leverage or information they would have in a competitive market to negotiate for higher salaries. These No-Poach Agreements thereby had the effect of suppressing compensation for all relevant employees of Defendants.

## **FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING**

59. Throughout the Class Period, Defendants affirmatively and fraudulently concealed their unlawful conduct from discovery by Plaintiffs.

60. Plaintiffs did not discover and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy, and Defendants' and their co-conspirators'

involvement in the conspiracy, until April 3, 2018 when the DOJ's investigations first became public.

61. The affirmative acts of Defendants and their co-conspirators, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

62. Defendants and their co-conspirators agreed among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal conspiracy.

63. Defendants and their co-conspirators met and communicated secretly concerning the No-Poach Agreements as to avoid detection.

64. Plaintiffs could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy, or combination. Defendants' conspiracy was fraudulently concealed by various means and methods, including, but not limited to, secret meetings and surreptitious communications among Defendants.

65. Defendants openly presented themselves as competitors, including in public filings, and because of this Plaintiffs had the reasonable belief that Defendants would not secretly agree among themselves to suppress employee compensation. For example, Wabtec's 2017 Form 10-K listed Knorr as a "principal competitor." Knorr's 2017 Annual Report described the rail vehicle market as "highly competitive." And in the related commercial vehicle market, Knorr identified WABCO (another name for Wabtec) as "its principal competitor."

14

66. Defendants, and the outside recruiters acting as their agents, provided pretextual reasons for hiring practices and compensation decisions, which did not include revelation of the No-Poach Agreements to Plaintiffs or Class Members.

67. Because the alleged conspiracy was affirmatively concealed by Defendants and their co-conspirators until April 3, 2018, Plaintiffs had no knowledge of the alleged conspiracy or any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed.

68. None of the facts or information available to Plaintiffs prior to April 3, 2018, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy.

69. As a result of Defendants' and their co-conspirators' fraudulent concealment of the conspiracy, the running of any statute of limitations has been tolled with respect to Plaintiffs' claims of anticompetitive conduct alleged in this Complaint.

## CLASS ACTION ALLEGATIONS

70. Plaintiffs bring this action on their own behalf and as a class action pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class (the "Class"):

> All persons employed in the United States by Defendants, including any business unit or subsidiary of Defendants, at any time from January 1, 2009 to April 3, 2018. Excluded from the class are senior executives and personnel in the recruiting departments of the Defendants.

71. Plaintiffs do not know the exact number of members of the Class because such information is in the exclusive control of Defendants. Plaintiffs believe that Class members

number at least in the thousands and are sufficiently numerous and geographically dispersed throughout the United States such that joinder of all Class members is impracticable.

72. There are questions of law and fact which are common to the claims of Plaintiffs and the Class, including, but not limited to:

    a. Whether Defendants agreed upon, implemented, and policed the No-Poach Agreements;

    b. Whether the purpose and/or effect of the acts alleged herein was to restrain competition in the labor market;

    c. The existence and duration of the No-Poach Agreements alleged herein;

    d. Whether Defendants violated Section 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3);

    e. Whether Defendants' agents, officers, employees, or representatives participated in correspondence and meetings in furtherance of the illegal conspiracy alleged herein, and, if so, whether such agents, officers, employees, or representatives were acting within the scope of their authority and in furtherance of Defendants' business interests; and

    f. Whether, and to what extent, the conduct of Defendants caused injury to Plaintiffs and members of the Class, and, if so, the appropriate measure of damages.

73. Plaintiffs' claims are typical of the claims of the members of the Class.

74. Plaintiffs will fairly and adequately assert and protect the interests of the Class. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Class.

75. Plaintiffs are represented by counsel competent and experienced in the prosecution of antitrust and class action litigation.

76. The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

77. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because:

    a. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

    b. The Class is readily definable and one for which records should exist in the files of Defendants.

    c. Prosecution as a class action will eliminate the possibility of repetitious litigation.

    d. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would require.

    e. Class treatment will permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this complaint on an individual basis.

78. This class action presents no difficulties of management that would preclude its maintenance as a class action.

## COUNT I

## VIOLATION OF THE SHERMAN ACT §§ 1, 3

79. Plaintiffs incorporate by reference all allegations stated in this Complaint.

80. Defendants are direct competitors in the labor market for skilled rail industry employees.

81. Defendants entered into anticompetitive No-Poach Agreements that eliminated or reduced competition in the labor markets in which they compete and, in doing so, disrupted the typical bargaining and negotiation between employees and employers that would take place in those labor markets.

82. Defendants' No-Poach Agreements were facially anticompetitive because they eliminated competition to attract skilled labor in the United States rail industry.

83. Plaintiffs and members of the Class were deprived of the benefits of free, open, and unrestricted competition in the United States market for their services.

84. Defendants' and their co-conspirators' anticompetitive activities have directly and proximately caused injury to Plaintiffs and members of the Class in the United States.

85. Defendant's No-Poach Agreements denied Class Members access to better job opportunities, restricted their employment mobility, suppressed their compensation, and deprived them of information that they could have used to negotiate for better terms of employment, which has resulted in an amount of ascertainable damages to be established at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court:

A. Determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be give to members of the Class;

B.  Adjudge and decree that Defendants' unlawful contract, combination, or conspiracy constitutes a *per se* violation of Sections 1 and 3 of the Sherman Act;

C.  Enter judgment against Defendants, jointly and severally, in favor of Plaintiffs and the Class for treble damages determined to have been sustained by Plaintiffs and the Class by virtue of Defendants' and their co-conspirators' violations of the Sherman Act;

D.  Award Plaintiffs and the Class their attorneys' fees, litigation expenses, and court costs, as well as pre-judgment and post-judgment interest as permitted by United States law; and

E.  Grant Plaintiffs and the Class such other and further relief as the case may require, or as the Court deems just and proper under the circumstances.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury.

Respectfully submitted,

s/Russell T. Burke
Chad A. McGowan
McGowan, Hood & Felder, LLC
1539 Health Care Drive
Rock Hill, South Carolina 29732
(803) 327-7800
(803) 328-5656 Facsimile
cmcgowan@mcgowanhood.com

Russell T. Burke
McGowan, Hood & Felder, LLC
1517 Hampton Street
Columbia, SC 29201
(803) 779-0100
(803) 787-0750 Facsimile
rburke@mcgowanhood.com

ATTORNEYS FOR THE PLAINTIFFS

Columbia, South Carolina
June 13, 2018